United States National Bank in Johnstown, Appellant, *v.* Campbell et al.

484

Argued May 29, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*John E. Evans, Sr.*, with him *Evans, Evans & Spincelli, Roman C. Widmann* and *Harry Doerr*, for appellant.

*Morton Meyers*, with him *Graham, Yost, Meyers & Graham*, for appellees.

PER CURIAM, June 25, 1946:

Our review of this record discloses no reversible error. The decrees are affirmed on the following quoted portions of the adjudication filed by the chancellor in the court below.

"In 1929, examinations of The United States Trust Company of Johnstown and The United States Savings & Trust Company of Conemaugh by the State Banking Department showed impairments of $37,877.19 at the former and $94,454.32 at the latter. The Secretary of Banking required the impairments to be made good by a gift of cash or marketable securities. The closing of

these banks would have affected other banks in the neighborhood, particularly The United States National Bank of Johnstown, a large bank which controlled the impaired institutions through direct or indirect stock ownership. The important officers of the three institutions were the same, and key directors of The United States National Bank of Johnstown, long active in its affairs, were also directors of the two impaired institutions. The beneficial interest in the stock of all these banks was in the stockholders of The United States National Bank. That bank controlled the affairs and the policies of her two subsidiary trust companies. The United States National Bank supplied the money to make good the impairments, but did not turn the money over directly to these institutions. It acted through another subsidiary, The United States Mortgage & Realty Company. This corporation, organized for the purpose of buying, selling and leasing real estate, was the real estate holding company of The United States National Bank, and held title to the bank building. All its stock except qualifying shares for directors was owned by The United States National Bank. The bank made two loans to the Mortgage & Realty Company, one of $37,877.19, the other of $94,454.32, and took back notes of the Mortgage & Realty Company for these amounts. The Mortgage & Realty Company then turned the money over to the impaired institutions. The payments thus made cured the impairments, and the impaired institutions notified the Secretary of Banking that the impairments had been made good by the deposit of cash. On its minutes the Mortgage & Realty Company stated that it borrowed the two sums from The United States National Bank of Johnstown for the purpose of purchasing 'real estate equities' from the impaired institutions.

"At the time the impairments were cured in 1929, agreements in identical language were entered into between the two impaired institutions and The United States Mortgage & Realty Company. Each institution

assigned to the Mortgage & Realty Company 'all its right, title and interest of, in and to' certain notes and bonds principally of Cook and Cooney. All these notes and bonds were admittedly worthless. The agreements contain the following further provision: 'together with such real estate equities as are represented in, collateral to, and accompany said securities, as well as the death values of certain life insurance policies, when, as and if sold, or if paid at maturity, the said assignee to participate therein with the assignor, as their respective interests may appear.' The impaired institutions held these life insurance policies as security for the obligations of Cooney and Cook.

"It is now admitted that there were no real estate equities, whatever this term means. The controversy concerns the proceeds of the insurance on the lives of Cook and Cooney that was held by the impaired institutions as collateral security for their indebtedness . . .

"The plaintiff contends that the money put up in 1929 to cure the impairments was a loan and that it is therefore entitled to payment in full from the proceeds of the insurance before the defendants get anything. We are unable to so construe the assignments. They are exactly what they purport to be, viz: assignments of certain obligations with a pro rata interest in collateral. They contain no promise to pay. The impaired trust companies 'sell, assign, transfer and set over unto The United States Mortgage & Realty Company—all (their) right, title and interest of, in and to' certain obligations together with an interest in life insurance, both parties to participate in the insurance when paid 'as their respective interests may appear.' Such an instrument is an assignment, not a loan, and the parties share in the proceeds of the collateral pro rata. The assignments themselves plainly provide that the parties are to participate (i. e. take a part) as their respective interests may appear. The United States National Bank does not seek to participate as its interests may appear; it asks

for payment in full before the defendants get anything. We are satisfied that this is not the proper construction of the assignments. Nothing in the assignments shows an intention on the part of the assigning trust companies to guarantee payment of the obligations assigned or to give the assignee any priority, and the surrounding circumstances negative such intention. Therefore, the principle of *North City Trust Company Case,* 327 Pa. 356, cited by the plaintiff, does not apply. The trust companies were insolvent at the time the assignments were made and the payments by the Mortgage & Realty Company were made to cure impairments. Loans would not have cured the impairments, nor would the impairments have been cured if the assigning trust companies had guaranteed payment of these worthless obligations . . .

"At the time of the assignments the two trust companies had paid large sums as premiums on the policies. The defendants claim the right to deduct such payments from the fund. In our opinion, the payments are a proper charge against the fund . . . We are satisfied that such was the intention of the parties under the assignments. What was assigned to the Mortgage & Realty Company was a portion of the debts of Cook and Cooney with a corresponding interest in the collateral. It purchased notes and bonds. The impaired institutions retained the balance of the debts. Anything applicable to the debts must be divided between the parties 'as their respective interests may appear.' But before anything is applied to the debt, the expenses with interest must first come out. The Mortgage & Realty Company purchased no interest in these prior charges. It purchased only an interest in what would be applied on the debt. Therefore, the trust companies are entitled to deduct premiums paid by them prior to the assignments, with interest, which are a prior charge on the proceeds derived from the securities, before anything is applied on the debts of Cook and Cooney.

"Consideration of the surrounding circumstances at the time the assignments were made bears out this con-

struction. It is always proper to consider the surrounding circumstances. *Bubb v. Parker & Edwards Oil Co.*, 252 Pa. 26, 29; Restatement, Contracts, section 235, p. 324. The payments by the Mortgage Company to the impaired institutions were made to cure impairments and had to be gifts 'without restriction, reservation or expectation of return.' The trust companies could not turn over assets of value or the impairments would not be corrected. *Hillcrest Foundation, Inc. v. McFeaters*, 332 Pa. 497. The premium payments made by the trust companies were prior charges on the policies and created value in them. The impaired institutions could not turn over this asset of value in their impaired condition. They assigned to the Mortgage & Realty Company only a pro rata interest in the 'death value' of the life insurance, not in the cash surrender value or in any other feature of the insurance. We are satisfied that the assignments when read in the light of the surrounding circumstances gave the assignee no interest in the premium payments theretofore made by the trust companies.

"We next consider the defendants' claim for reimbursement of premiums paid after the assignments. After the assignments, the Mortgage & Realty Company held part of the notes of Cook and Cooney, and the trust companies held the balance. The life insurance continued to be held by the trust company for the joint benefit of both parties. The trust companies, and later their liquidating trustees, paid premiums on the insurance after the assignments, for the joint benefit of both parties. Such payments with interest are likewise a prior charge on the fund. The payments made the fund available and it would be inequitable to permit the Mortgage & Realty Company, and now the plaintiff which succeeded to its rights, to escape payment of its pro rata share. While the assignments are silent on the subject of premiums, equitable principles apply . . .

"The assignments themselves bear out this construction. They do not provide for fixed amounts or percen-

tages to be paid to the parties. They provide that the parties shall participate as their respective interests may appear. This term implies a future, not a present, state of affairs. The respective interests fluctuate, just as in the case of fire insurance with mortgagee clauses payable to the mortgagee as his interest may appear. As the mortgagor makes partial payments, the amount due the mortgagee becomes less and his interest in the fire insurance less; and the interest of the mortgagor becomes correspondingly greater. In the same way here, when the parties provided that they were to participate 'as their respective interests may appear' we are of the opinion that they had in mind a situation where the respective interests of the parties were not fixed but would fluctuate constantly because of the payment of premiums.

"We see nothing in the assignments requiring the trust companies to pay premiums for the benefit of the Mortgage & Realty Company, and the surrounding circumstances negative this contention. The trust companies were insolvent, and their impairments could be cured only by a gift 'without restriction, reservation or expectation of return.' The correction had to be unqualified, unconditional and unburdened. The trust companies could not make a binding obligation, directly or indirectly, to repay the amount supplied to make good the impairments, or any part of it, for such an agreement would have defeated the correction of the impairments.

"The construction of the assignments by the parties shows that it was not intended that the trust companies were alone to bear the expense of keeping up payment of premiums. A construction of a contract placed on it by the parties will be upheld. Restatement, Contracts, section 235e; *Neon Corp. v. Pa. Distilling Co.*, 325 Pa. 140, 143. The correspondence between these parties, quoted in the findings of fact, shows that it was the intention of both parties that premiums paid by the defendants and their predecessors were first to be deducted out of the proceeds of the life insurance . . .

"The defendants are also entitled to interest on premiums paid for the benefit of the plaintiff and its predecessors. 'The amount to which the paying co-tenant is entitled should include interest.' 62 C. J. 485. See also *Weiskircher v. Connelly*, 248 Pa. 327; 37 C. J. 437; *McCutcheon's Appeal*, 99 Pa. 133, 138; *Hentz v. Penna. Co.*, 134 Pa. 343.

"The next question is whether the defendants may deduct attorneys' fees paid by them. In order to collect the insurance it was necessary for the defendant trustees to employ counsel. Serious litigation was threatened, and the right of the trustees to collect was challenged. Cook, during his lifetime, and the heirs of Cooney after Cooney's death, questioned the validity of their original assignments of the policies. The plaintiff does not deny that the services of counsel were necessary to collect the fund from the insurance companies, and no objection is made to the amount of the fee. The objection is to the right of the defendants to charge the fund with payment of fees for services performed in obtaining payment of the policies on the ground that the assignors warranted their title to the insurance policies since the assignments on their face state that the assignors were the absolute assignees of the policies.

"The assignments are silent on the subject of counsel fees. The defendants were trustees of this insurance for themselves and for The United States National Bank. Where a trustee employs counsel to protect the trust property, the trust fund is liable for the expenses as a necessary cost of administration. Restatement, Trusts, section 188c, p. 492; *Rambo's Estate*, 327 Pa. 258; *Mead v. Sherwin*, 275 Pa. 146. It would be inequitable to require the defendant trustees to bear the full amount of counsel fees and expenses incurred for the joint benefit of both parties . . .

"In the defendants' account, they claim credit for $400.00 burial expenses for Cooney and $322.33, expense of his last illness at the Memorial Hospital, Johnstown. The plaintiff excepts to these payments.

"After Cooney's death, there was a controversy with his heirs about the payment of the insurance in this case. Payment of the hospital bill and burial expenses was expected to remove the objection of Cooney's heirs to the payment of the insurance proceeds to the trustees.

"The payment of these relatively small sums was within the broad powers given to the trustees under the plan of reorganization of The United States Trust Company of Johnstown and The United States Savings & Trust Company of Conemaugh, consented to in writing by The United States Mortgage & Realty Company, under which the trustees were given power 'to compromise and to take such other action and have such other powers as may in their judgment be necessary or proper for the liquidating of the assets transferred to them, with the same degree of power and control as if the said assets were owned by the trustees in their own right.'

"Objection is made by the plaintiff to the fact that The United States Trust Company of Johnstown and The United States Savings & Trust Company of Conemaugh, and later their trustees, paid some of the premiums on the insurance by policy loans. Such loans were authorized by the directors of these institutions who, as previously pointed out, were to a large extent directors of The United States Mortgage & Realty Company, as well as of The United States National Bank of Johnstown. The four institutions were allied and affiliated and were controlled in their affairs and policies by The United States National Bank of Johnstown. We are satisfied that the loans were made with the knowledge and approval of The United States Mortgage & Realty Company and of The United States National Bank of Johnstown.

"Moreover, the matter of loans on these policies was the subject of correspondence between the parties. In 1936 the attorneys for the trustees of The United States Savings & Trust Company of Conemaugh wrote to The United States Mortgage & Realty Company that a

premium of about $3,600.00 was due on the Cooney poli-cies and stated that the trustees of the bank desired to borrow on the cash surrender value of one of the other policies included in the assignments in order to pay the premiums. The Mortgage & Realty Company replied, consenting to the borrowing. This is contrary to the present position of the plaintiff that premiums had to be paid in cash. . . .

"Included in the assignment to The United States Mortgage & Realty Company from The United States Savings & Trust Company of Conemaugh are two $5,000.00 insurance policies on the life of John H. Cooney in the Connecticut General Life Insurance Company No. 243930 and No. 243931, each dated June 26, 1929. These policies were ten year term policies, but could be converted to ordinary life policies before the expiration of the term. In February, 1930, The United States Savings & Trust Company of Conemaugh converted the policies to ordinary life policies by paying additional premiums in substantial amounts and changed the beneficiary of the policies to The United States Trust Company of Johnstown, giving the beneficiary full and absolute control of the policies and, in effect, making the beneficiary the owner of the policies. The United States Trust Company was later taken over by The Johnstown Trust Company which is now being liquidated by trustees. On the death of Cooney, the proceeds of these policies were paid to the Trustees of The Johnstown Trust Company. In the bill at No. 13 September Term, 1942, the Trustees of The United States Savings & Trust Company of Conemaugh are asked to account for these proceeds. But they never received these proceeds, and are, therefore, not accountable for them. In view of the close connection between all these institutions in 1930, we must assume that the parties intended to eliminate any interest of The United States Mortgage & Realty Company in the converted policies . . ."

Decree of the court below affirmed.

The costs shall be paid by appellant.