618 A.2d 985

Maria C. MOLITORIS

v.

Robert J. WOODS, Three Rivers Regatta Association,
and U.S. Formula One Racing Association, Inc.

Appeal of: BORDEN, INC.

Maria C. MOLITORIS

v.

Robert J. WOODS, Three Rivers Regatta Association,
and U.S. Formula One Racing Association, Inc.

Appeal of: ROTHMAN, GORDON, FOREMAN,
AND GROUDINE, P.C.

Superior Court of Pennsylvania.

Argued Sept. 15, 1992.

Filed Dec. 21, 1992.

2

Eileen A. Groves, Columbus, OH, for Borden.

4

Carl E. Harvison, Pittsburgh, for Rothman, Gordon, Foreman & Groudine, P.C.

Before ROWLEY, President Judge, and CIRILLO and MONTGOMERY, JJ.

ROWLEY, President Judge:

Borden, Inc. (hereinafter "Borden") and the law firm of Rothman, Gordon, Foreman and Groudine, P.C. (hereinafter "Rothman Gordon") have filed cross-appeals from the trial court's order granting Rothman Gordon's petition to enforce an attorney's charging lien. The order awarded Rothman Gordon the sum of $9,767.48 to be paid out of an escrow fund established from sums recovered by the law firm on behalf of Maria Molitoris (hereinafter "plaintiff") and Borden in the underlying personal injury action. The appeals of Borden and Rothman Gordon have been consolidated. We affirm.

The facts giving rise to this appeal follow. In the summer of 1988, plaintiff attended an annual boating festival in Pittsburgh known as the Three Rivers Regatta. While there, she sustained serious injuries as a Formula One power boat racing on the river went out of control, left the race course and crashed into observers on the bank of the river. Approximately one month later, in September of 1988, plaintiff retained Rothman Gordon to represent her in any legal action which she may have had against the party or parties responsible for the Regatta accident. Within the firm, attorney William R. Crum, Jr. was assigned to plaintiff's case.

At the time of the accident, plaintiff was an employee of Viviano Macaroni Company, a subsidiary of Borden. As such, she was insured by the Borden, Inc. Total Family Protection Plan (hereinafter "TFPP"), an ERISA qualified employee welfare benefit plan providing medical benefits for Borden employees. A total of $63,829.30 was paid by TFPP in dental and medical benefits on behalf of plaintiff as a result of the Regatta accident.

On or about December 5, 1988, in order to prepare the damage portion of plaintiff's case against Robert J. Woods,

Three Rivers Regatta Association, and U.S. Formula One Racing Association, Inc. (hereinafter "the defendants"), attorney Crum contacted Borden TFPP's administrative offices to obtain information concerning the precise amount of medical benefits paid to date on behalf of plaintiff. An employee of Borden, Mary Redmond, responded to attorney Crum's request by providing him with a computer print-out of the total medical benefits resulting from the Regatta accident which Borden had paid on behalf of plaintiff as of December 5, 1988.

Thereafter, in the normal course of business, attorney Crum forwarded a report regarding the medical necessity of plaintiff's cervicothoracic brace and a recently incurred bill therefor to Mary Redmond, as Borden's agent. In the accompanying letter, dated December 12, 1988, attorney Crum advised Redmond that Rothman Gordon could represent Borden's subrogation interest for one-third of any amount collected on its behalf and that if Borden wished to retain Rothman Gordon for that purpose, an agent of Borden should so confirm in writing.

In response, by letter dated January 26, 1989, a Borden claims adjuster, Janice Paxton, advised Rothman Gordon that "Borden exercises the right to *subrogate* against any third-party settlements" and also advised that "the thirty-three and one-third percent is an agreeable amount [for Rothman Gordon's fee] on this *subrogation* case." (Reproduced Record, pp. 8a and 177a) (emphasis added). Whereupon, by letter dated January 30, 1989, attorney Crum acknowledged Rothman Gordon's receipt of the January 26, 1989 letter and reiterated his understanding that the firm was hired to protect Borden's *subrogation* interest for the fee of thirty-three and one-third percent. (emphasis added).

In the early part of February 1989, plaintiff signed a reimbursement agreement which had been forwarded by Ms. Paxton to attorney Crum. The agreement provided that plaintiff, as "the beneficiary [of medical and/or dental benefits paid by TFPP] agree[d] that upon receipt of full or partial payment from [a] third party, she would immediately reimburse [TFPP] for the amounts so advanced." From February

1989 until December 1990, plaintiff continued to receive medical treatment for her ongoing personal injuries and Rothman Gordon prepared her case against the defendants.

Early in 1991, a writ of summons was filed against the defendants for the injuries sustained by plaintiff in the Regatta accident[1]. Due to the fact that other parties injured in the Regatta accident had also filed claims against the same defendants, a special conciliation conference was held by the Honorable Judge Murphy on April 18, 1991 to pursue the possibility of settlement in all of the Regatta cases. Attorney Carl Harvison of Rothman Gordon attended that conference in attorney Crum's stead and advised the court and opposing counsel that Borden's subrogation interests would have to be protected in any settlement. No settlement was reached that day because the defendants proposed a structured settlement in which plaintiff would receive $70,000.00 initially and monthly payments thereafter but no proposal was made regarding satisfaction of Borden's claim.

Thereafter, on April 22, 1991, attorney Harvison discussed the settlement conference with an agent of Borden, Donna Stratton, and advised her of defendants' unacceptable settlement offer. He then asked her, as part of his preparation for the second conciliation conference, "if Borden would consider accepting" a compromise amount based on a structured settlement. Thereafter, Ms. Stratton replied to attorney Harvison that Borden had authorized her to accept a structured settlement consisting of $10,000.00 at the time of settlement, $5,000.00 in 5 years, $5,000.00 in 10 years, and the balance of the amount owed minus attorney's fees in 15 years.

A second conciliation conference was scheduled for May 9, 1991. On May 6, 1991, attorney Harvison telephoned Ms. Stratton to inform her that pursuant to local rule and a specific request by Judge Murphy, a representative of Borden should be at the May 9 conference. Ms. Stratton, who was without authority to authorize business travel, contacted Eileen Groves, Esquire, in the office of Borden's General Coun-

---

1. We note that a complaint was drafted but never filed in this action because the matter proceeded to settlement.

sel. On the next day, May 7, 1991, attorney Groves contacted attorney Crum in order to ascertain the reason that Borden's presence at the conference was required. She testified that this was the first time that she was made aware of the fact that Rothman Gordon represented both plaintiff and Borden in this matter and that upon learning of it, she terminated any further representation of Borden by Rothman Gordon due to her concern over an alleged conflict of interest.

At the May 9 settlement conference, Rothman Gordon attended to represent plaintiff's interest and Donna Stratton, accompanied by newly retained counsel, attended to represent Borden's interest. All parties reached a settlement. Specifically, Borden agreed to accept a $42,000.00 cash payment in settlement of all medical payments it had made on behalf of plaintiff. The $42,000.00 was to be paid to Borden within 30 days after the conference. Prior to its conclusion, Borden's representatives left the conference [2].

Thereafter, the Rothman Gordon attorneys attending the conference advised the court of the firm's position concerning Borden's obligation, notwithstanding the May 9 termination of Rothman Gordon, to pay the firm for efforts expended by it to pursue ongoing settlement negotiations from 1989–1991. The Court was informed that Rothman Gordon intended to make a claim against Borden for thirty-three and one-third percent of Borden's settlement pursuant to the parties' oral and written contingency fee agreements. Whereupon, as part of its order, the trial court directed that Borden's $42,000.00 be held temporarily by the Allegheny County Prothonotary's office until the fee dispute was resolved. Rothman Gordon was directed to proceed with the appropriate claim for attorney's fees.

On June 5, 1991, the firm filed a Petition to Enforce a Charging Lien, to collect approximately $14,000.00 of the funds on deposit in the Prothonotary's office. A hearing was

2. We note that Borden maintains that its representatives were "excused" by the Court from further attendance at the conference. However, Rothman Gordon contends that Borden's representatives unexpectedly departed from the courtroom without advising the court of an intention to do so.

scheduled for October 23, 1991 before Judge Murphy. Shortly before Rothman Gordon had filed its petition, attorney Harvison of Rothman Gordon advised Borden's attorney, Mr. McCreary, that Rothman Gordon would not oppose a motion on behalf of Borden to obtain the $28,000.00 of Borden's settlement *not* in dispute which was being held by the Prothonotary. Nevertheless, such a motion was not made until just prior to the October 23, 1991 hearing on Rothman Gordon's petition.

Following the hearing, Judge Murphy rendered his decision. Finding that because Rothman Gordon had reduced its attorney's fees to be received from Maria Molitoris to approximately twenty-five percent, fairness dictated that the fee to be received from Borden should likewise be reduced. Moreover, the court concluded that, in fairness, Rothman Gordon's fee should be further reduced by the travel expenses incurred by Stratton and Groves to appear at the hearing on behalf of Borden as witnesses. Therefore, Judge Murphy ordered that the Prothonotary disburse only $9,767.48 of the $14,000.00 on deposit with that office to Rothman Gordon, and that the remainder, less costs, be released to Borden in the amount of $4,256.23. Subsequently, Borden filed this timely appeal and Rothman Gordon has cross-appealed.

On appeal, Borden has provided this Court with several arguments as to why the trial court erred in upholding Rothman Gordon's claim for attorney's fees. First, Borden claims that "the solicitation [of representation] and representation agreement with Rothman Gordon was void as against public policy and not valid" (Borden's Brief, p. 11)[3] in that the solicitation was improper under Rule 7.3 and the representation of "multiple clients" was a "conflict of interest" which violated Rule 1.7(a) of the Rules of Professional Conduct. Secondly, Borden argues that "a material mistake in the terms of the agreement between Borden and Rothman Gordon ... invalidated the agreement [between them]" because the firm

---

**3.** We note that Rothman Gordon argues that its claim for attorney's fees is not based on an agreement but upon quantum meruit for work performed by Rothman Gordon for the benefit of Borden prior to the termination of the former by the latter.

misunderstood the nature of its representation of Borden and mistakenly pursued subrogation rather than *"reimbursement."* Further, it is claimed that "Rothman Gordon materially altered the terms of the [settlement] agreement..result[ing] in a breach of the [representation] agreement." Finally, Borden maintains that the trial court "improperly awarded attorney's fees for an Attorney's Charging Lien when there was no demand and [subsequent] refusal [of payment] or satisfaction of procedural prerequisites." (Borden's Brief, p. 21). Rothman Gordon contends, and we agree, that Borden's claims are without merit.

First, we conclude that Rothman Gordon's representation of both plaintiff and Borden in the Molitoris matter did not create a conflict of interest. All documents transferred between the parties during the pendency of this matter, including attorney Groves' letter confirming Rothman Gordon's termination, utilized either the term "subrogate" or "subrogation" in referring to its interest in the underlying litigation against the defendants and Rothman Gordon's representation thereof. Furthermore, all oral communications between the parties up until Rothman Gordon's termination on May 7, 1991 referred to Borden's subrogation interest.

Black's Law Dictionary instructs us that subrogation is the "substitution of one [entity] in the place of another with reference to a lawful claim, demand, or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies or securities." Black's Law Dictionary 1279 (5th ed. 1979). Moreover, as this Court noted in *Daley–Sand v. West American Insurance Co.,* 387 Pa.Super. 630, 564 A.2d 965 (1989):

> When an insurer pays a [medical] claim ..., it is actually paying the debt of the tortfeasor. The insurer is only secondarily liable; it is the tortfeasor who is primarily liable. Once the insurer has paid a claim to the insured, it may then stand in the shoes of the insured and assert the insured's rights against the tortfeasor. The right to stand in the insured's shoes and to collect from the tortfeasor once

it has paid the insured an amount representing the tortfeasor's debt is called the insurer's right to subrogation.

\*      \*      \*      \*      \*      \*

The right of subrogation may be contractually declared or founded in equity, *but even if contractually declared,* it is to be regarded as based upon and governed by *equitable principles.* It has often been said that the equitable doctrine of subrogation places the subrogee in the *precise position* of the one to whose rights and disabilities he is subrogated. (citations omitted).

*Id.* at 638–639, 564 A.2d at 969–970 (emphasis added).

In the instant case, the subrogation interest of Borden was *identical* to, and therefore did not conflict with, the interest of Maria Molitoris in recovering against the various defendants named in the underlying personal injury litigation. Furthermore, we note that in *Allstate Insurance Company v. Clarke,* 364 Pa.Super. 196, 527 A.2d 1021 (1987), this Court implicitly concluded that an attorney's representation of both an insured and an insurer's subrogation claim concerning the insured was not a conflict of interest. Rather, this Court noted the practical necessity, in cases such as the instant one, of an insurance carrier joining in an insured's recovery attempts by having the same attorney represent both the insured and his insurer's subrogation interest. This Court stated, as follows:

We do not think the insurer can create a practical conflict of interests by asserting a subrogation right to proceeds from an insured's action for damages and then refusing to grant the insured's attorney authority to represent the subrogation interest as well. Nor do we think that such refusal warrants excusal of the subrogee insurer's equitable duty to share in a proportionate share of the costs in attaining such recovery.

*Id.* at 207, 527 A.2d at 1027 [4]. We therefore conclude that Rothman Gordon's representation of both Maria Molitoris and

---

4. We note that in the *Clarke* case, unlike the instant case, no agreement was in place between the insurer and the insured's attorney regarding that attorney's representation of the insurer's subrogation interest.

her insurer's subrogation interest did not violate public policy [5].

Next, Borden contends that it is not entitled to pay attorney's fees incurred in pursuit of settlement in the Molitoris matter because Rothman Gordon misunderstood the nature of Borden's interest in the matter to be one of "subrogation," when in reality it was one of "reimbursement." However, there is absolutely no support for this contention in the record. A review of both the documentary and testimonial evidence before the trial court negates Borden's assertion that it viewed the Molitoris matter as a "reimbursement" action as opposed to a "subrogation" action. As noted above, *all* of the documents transferred between the parties for over two years reflect a retention of Rothman Gordon to seek recovery of Borden's subrogation interest. Specifically, agents of Borden sent letters to the law firm on three separate occasions, January 26, 1989, December 31, 1990, and May 7, 1991, characterizing Borden's claim as a "subrogation" interest. The record is devoid of any evidence that Rothman Gordon was retained for any purpose other than pursuit of Borden's

Nevertheless, this Court required the insurer to share in the attorney's fees associated with attaining recovery against the tortfeasors.

In the present case, there *was* an agreement between representatives of Borden and Rothman Gordon which specifically stated that Rothman Gordon was to pursue Borden's subrogation interest. Therefore, Rothman Gordon stands in a better position in this case to receive attorney fees than did the insured's attorney in *Clarke*.

5. Borden also argues that the representation was void as against public policy due to Rothman Gordon's alleged violations of Rules 1.7(a) and 7.3 of the Pennsylvania Rules of Professional Conduct. These arguments are completely meritless.

In *Maritrans GP, Inc. v. Pepper, Hamilton and Scheetz*, 529 Pa. 241, 602 A.2d 1277 (1992), our Supreme Court reaffirmed the principle stated in the Preamble to the Rules of Professional Conduct, that neither the rules, nor the Code of Professional Responsibility previously in effect, *per se* create a legal cause of action in clients or other private parties for a violation thereof. Rather, our high Court held, a client or private party may bring an action to enjoin an attorney from breaching his common law fiduciary duty to avoid conflicts of interest. We have already concluded that no conflict of interest existed in the instant case and therefore, we conclude that Rothman Gordon did not breach any common law duty which would support Borden's arguments.

subrogation interest [6]. Borden, therefore, must pay the attorney's fees rightfully earned by Rothman Gordon as a result of Borden's retention of the law firm.

Borden also claims that "Rothman Gordon materially *altered* the terms of the Borden settlement agreed upon with the Court on May 9, 1991 [such that Borden suffered] a material loss" by discussing the issue of attorney's fees with the Court after Borden's representatives left the conference. The transcript of the hearing on Rothman Gordon's petition reveals that at the settlement conference on May 9, 1991, Borden "had already agreed to resolve [its] particular aspect of the [settlement], and [the trial court concluded that] there was no need for [Borden's representatives] to be there to witness any bloodshed that was going to occur between the Court and Rothman Gordon" regarding fees. (Reproduced Record, pp. 125a and 126a). We do not believe that the *Court's* conduction of a discussion with Rothman Gordon after Borden's representatives chose to leave the conference regarding Rothman Gordon's intention to file the instant petition can be used as a reason to withhold the attorney's fees rightfully earned by Rothman Gordon in this matter. Nor, do we believe that this discussion in any way "altered" the settlement Borden reached with the tortfeasors in the Molitoris matter.

Finally, Borden argues that Rothman Gordon is not entitled to receive attorney's fees for representing Borden's subrogation interest because "at no time prior to the filing of the petition did Rothman Gordon submit a bill for its services nor did Borden reject such a bill" and because Rothman Gordon "failed to satisfy the prerequisites of a Charging Lien

6. We note that Borden had two alternative courses of action to recover money it had paid for Molitoris' medical benefits as a result of the Regatta accident. First, Borden could have elected to sue Molitoris directly pursuant to the reimbursement agreement signed by her *after* she had collected damages from the defendant tortfeasors. Or, secondly, Borden could have pursued its subrogation interest contemporaneously with Molitoris' pursuit of her own damages through ongoing settlement negotiations with the defendant tortfeasors. Borden chose the latter and must now pay the costs associated with its choice.

under Pennsylvania ... law." (Borden's Brief, p. 23). The law in this Commonwealth regarding charging liens was reiterated by the Commonwealth Court in *Brandywine Savings and Loan Assoc. v. Redevelopment Authority of Chester County*, 100 Pa.Cmwlth. 294, 514 A.2d 673 (1986), *alloc. denied*, 515 Pa. 586, 527 A.2d 545 (1987), as follows:

> [B]efore a charging lien will be recognized and applied, it must appear (1) that there is a fund in court or otherwise applicable for distribution on equitable principles, (2) that the services of an attorney operated substantially or primarily to secure the fund out of which he seeks to be paid, (3) that it was agreed that counsel look to the fund rather than the client for his compensation, (4) that the lien claimed is limited to costs, fees or other disbursements incurred in the litigation by which the fund was raised, and (5) that there are equitable considerations which necessitate the recognition and application of the charging lien. [*Recht v. Clairton Urban Redevelopment Authority*, 402 Pa. 599, 608, 168 A.2d 134, 138–139 (1961) ].

*Id.* at 298, 514 A.2d at 674–675.

In the instant case, there is a fund "applicable for distribution on equitable principles" which was created primarily through the efforts of Rothman Gordon's representation of Borden's subrogation interest. Indeed, attorneys Crum and Harvison pursued ongoing settlement negotiations until their termination by Borden just two days before Borden settled its claim for $42,000.00. Furthermore, pursuant to the contingent fee agreement existing between the parties, Rothman Gordon's right to recover a fee was inexorably linked to satisfaction of Borden's subrogation interest. Had there been no recovery by Borden, Rothman Gordon could not have looked to Borden for compensation [7]. And, finally, as noted

---

7. Borden claims that Rothman Gordon's failure to present a bill for services rendered to Borden precludes an award of attorney's fees in the instant case. However, no legal authority has been offered by Borden to support this contention. Furthermore, uncontradicted testimony in the record reflects that "Borden told [Rothman Gordon] that they weren't going to pay anything [the firm] sent to them anyway." (Reproduced Record, p. 123a). As we have noted, enforcement of an

14

above, it has been held in this Commonwealth that a "subrogee insurer [has an] equitable duty to share in a proportionate share of the costs in attaining such recovery." *Clarke* at 207, 527 A.2d 1021 at 1027. Therefore, we conclude that the *Recht* requirements delineated above were met by Rothman Gordon in the instant case.

■ We turn now to Rothman Gordon's cross-appeal. Rothman Gordon's position is that the trial court abused its discretion in establishing the amount of the attorney's charging lien at twenty-five percent rather than thirty-three and one-third percent of the amount Borden received at settlement. We note that:

> [a]n abuse of discretion is not merely an error of judgment, but if in reaching a conclusion, the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Moyer,* 497 Pa. 643, 647, 444 A.2d 101, 103 (1982). In the instant case, there is no evidence that the trial court's conclusions were manifestly unreasonable or the result of partiality and therefore, given the factual circumstances of this case, we find that the trial court's reasons for calculating the amount of the lien do not constitute an abuse of discretion. Furthermore, we note that at oral argument, counsel for Rothman Gordon indicated to this Court that the firm would willingly accept the amount established by the trial court if this Court were to affirm the trial court's order.

Therefore, for all of the foregoing reasons, we decide that the trial court did not err in granting Rothman Gordon's petition. We affirm the trial court's order disbursing the relevant funds on deposit with the Allegheny County Protho-

attorney's charging lien must be governed by equitable principles and in the present appeal, equity demands that Borden pay its share of the cost associated with attaining its $42,000.00 recovery, regardless of whether Rothman Gordon formally presented a bill for services which Borden had already advised Rothman Gordon it would not honor. *See: Allstate Insurance Co. v. Clarke,* 364 Pa.Super. 196, 527 A.2d 1021 (1987).

notary as follows: $9,767.48 to Rothman Gordon and $4,256.23 to Borden.

Order affirmed.