**Resource Properties XLIV Inc. v. Philadelphia Authority for Industrial Development**

*Kevin F. Berry,* for plaintiff.
*Kenneth E. Aaron* and *Jami Nimeroff,* for defendants.

SHEPPARD JR., *J.,* June 5, 2001—Defendants, LLOT Inc. and Growth Properties Ltd.-LLOT General Partnership (G-L) (collectively, LLOT defendants),[1] have filed

---

1. The remaining defendants in the confession action are the Philadelphia Authority for Industrial Development (PAID) and Growth Prop-

a motion for summary judgment requesting that the claims of Resource Properties XLIV Inc. be dismissed. Resource asserts claims both in its own name and as successor in interest to CoreStates Bank's name in the action number C.C.P. November term 1999, no. 1265 (confession action), and as successor in interest to Radnor Financial Group Inc. in the action number C.C.P. March Term 2000, no. 3750 (subrogation action).

This court concludes that the LLOT defendants are not entitled to summary judgment and has denied their motion.

## BACKGROUND

This case centers on documents executed in connection with three events: a 1984 industrial development loan transaction; a 1991 resolution of disputes arising between certain parties to the transaction; and a transfer of certain transaction rights to Resource in 1998.

On October 11, 1994, CoreStates, then known as The Philadelphia National Bank, entered into the transaction with the LLOT defendants, among others, through PAID. The ultimate result of the transaction was that the LLOT defendants, Growth and Sheridan (subrogation action defendants) incurred an obligation of $6 million to CoreStates, with CoreStates holding a mortgage on property owned by the subrogation action defendants as a security interest. In the event of a default, Radnor[2] was

---

erties Ltd. The remaining defendants in the subrogation action are Sheridan Associates and Growth.

2. Radnor was the parent corporation of one of the corporate partners of the general partner of Sheridan.

to purchase the notes evidencing the subrogation action defendants' obligation from CoreStates.

To effect the transaction, the parties entered into several agreements, including the following:

• A "construction loan agreement" outlining certain construction improvements to be made to the property and summarizing the terms of the transaction (exhibit 1);

• Three notes, totaling $6 million, and three mortgages issued by PAID in favor of CoreStates. The principal under the "first note" was $3 million, the principal under the "second note" (exhibit 2) was $2 million, and the principal under the "third note" (exhibit 3) was $1 million. The mortgages were secured by property located at 125-37 South Ninth Street. Exhibit 1 at ¶2;

• An "installment sale agreement" (exhibit 4), under which PAID transferred the property to the subrogation action defendants in exchange for a promise of future payments. The payment obligations of the borrowers under the installment sale agreement were co-extensive with the obligations of PAID under the notes and mortgages;

• Three "ISA assignments" (exhibit 5), pursuant to which PAID assigned its rights under the installment sales agreement and its remaining interest in the property to CoreStates; and

• A "permanent commitment" from Radnor to CoreStates. (Exhibit 6.) Under the permanent commitment, Radnor agreed to purchase CoreStates' interest in the second and third notes and mortgages upon default by the borrowers. Exhibit 6 at ¶1. The purchase price for

these notes and mortgages was the amount owed on the notes, including principal, accrued interest and other sums, at the time Radnor purchased the notes. *Id.* at ¶4.[3]

At some point in 1991, CoreStates, Radnor and the subrogation action defendants became embroiled in a dispute related to the property and payments under the notes and installment sale agreement. In several documents dated as of December 31, 1991, these entities agreed to the resolution of this dispute:

• A "resolution agreement" (exhibit 8), whereby Radnor released G-L and Growth from claims connected to the property and the relationships between Radnor and Growth or G-L;[4] and

• A "modification agreement" (exhibit 7), under which Radnor agreed to secure its obligation to purchase the notes, as provided in the permanent commitment, with a $2.2 million cash collateral. Exhibit 7 at ¶3(c). The modification agreement permitted CoreStates to liquidate the collateral in the event of a default and apply to the outstanding balance on third and second notes, in that order. *Id.* at ¶4. The modification agreement also provided that Radnor was to have no interest in the "second loan" until the entire purchase price was paid. *Id.* Shortly after the resolution, Radnor posted the collateral. Resource's memorandum at 5.

In December 1994, the subrogation action defendants and PAID defaulted on their obligations under the in-

---

3. The purchase price was limited to the face amount of the notes, plus accrued interest and other sums payable under the notes and the relevant loan documents.

4. This provision found in paragraph 5 of exhibit 8 is referred to as the "release."

stallment sale agreement and the notes. Resource's memorandum at 6; LLOT defendants' memorandum at 6. CoreStates sent a letter to Radnor demanding that it purchase the notes on December 22, 1994. (Exhibit 9.) On January 5, 1995, CoreStates notified PAID and the borrowers of their default and informed Radnor that it had liquidated the collateral, which totaled $2,206,244.19, and applied the proceeds to the purchase price. (Exhibit 11.) While this eliminated the principal outstanding balance on the third note, it left a balance of $1,127,747 on the second note. Exhibit 15 at ¶8.

When Radnor failed to pay the outstanding balance of the purchase price, CoreStates brought suit against Radnor seeking to enforce its purchase obligations under the permanent commitment and the modification agreement (guarantee action).[5] Radnor, in turn, filed a counterclaim alleging that CoreStates had improperly liquidated the collateral.[6] Exhibit 30. CoreStates also filed a second action against 10 defendants, including PAID and the LLOT defendants, on February 27, 1995, to foreclose on the first and second mortgages.[7] Resource's

---

5. *CoreStates Bank v. Radnor Fin. Corp.*, February term 1995, no. 2943 (C.P. Phila.). The complaint filed in the guarantee action has been attached as exhibit 16.

6. As its defense, Radnor asserted that it was relieved of its purchase obligations. Under section 14 of the permanent commitment and section 2(b)(3) of the construction loan agreement, Radnor would not be required to purchase the notes if the net operating income from the property exceeded 1.2 times the debt service on the loans. Radnor contended that this requirement had been met.

7. CoreStates Bank v. Philadelphia Auth. for Indus. Dev., February term 1995, no. 3110 (C.P. Phila.). CoreStates did not seek payment on the third note and mortgage in the foreclosure action.

memorandum at 6; LLOT defendants' memorandum at 11.

On April 24, 1998, CoreStates transferred certain rights to Resource and agreed to settle the guarantee action. Resource's memorandum at 7; LLOT defendants' memorandum at 9. In connection with this settlement and transfer, CoreStates, Radnor, Resource and Sheridan entered into the following "settlement and transfer documents":

• An "agreement of sale,"[8] a "CoreStates absolute assignment" and an "assignment and allonge" (exhibits 17, 19, 20), under which CoreStates assigned all of its interest in the notes, mortgages, the foreclosure action and the guarantee action to Resource for $3.6 million. This amount represented the approximate balance due to CoreStates under the notes and mortgages. Exhibit 17 at ¶2(a);

• A "Radnor absolute assignment" (exhibit 22), whereby Radnor assigned its rights to the second and third mortgages and notes, including all subrogation rights, to Resource; and

• A "side letter." (Exhibit 21.) In the side letter, CoreStates agreed to limit Radnor's and Sheridan's liability to their interests in the property, settling the guarantee action as to the two of them. Exhibit 21 at ¶8. In addition, CoreStates, on the one hand, and Radnor and Sheridan, on the other, released each other from all claims arising in connection with the notes, and CoreStates paid Radnor $325,000. *Id.* at ¶¶1(a), 8, 9. Resource then pro-

---

8. The agreement of sale is dated as of December 31, 1997.

ceeded to trial as CoreStates' successor-in-interest in the foreclosure action.[9]

Resource confessed judgment against LLOT, L-G, Growth and PAID for amounts owed on the third note in the confession action on November 9, 1999. In addition, Resource subsequently initiated an action for equitable subrogation and unjust enrichment/quantum meruit in the subrogation action against the LLOT defendants, Growth and Sheridan.[10] These two actions were consolidated on October 12, 2000, and the LLOT defendants filed the instant motion for summary judgment in both actions.

## DISCUSSION

Pennsylvania Rule of Civil Procedure 1035.2 allows a court to enter summary judgment "whenever there is no genuine issue of any material fact as to a necessary element of the cause of action." A court must grant a motion for summary judgment when a non-moving party fails to "adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor." *Ertel v. Patriot-News Co.,* 544 Pa. 93, 101-102, 674 A.2d 1038, 1042 (1996), *cert. denied,* 519 U.S. 1008, 117 S.Ct. 512, 136 L.Ed.2d 401 (1996). Where there are material issues of fact, however, summary judgment may not be granted.

---

9. Judgment was entered in favor of Resource in the foreclosure action on February 1, 2000 in the amount of $2,211,426.97. Exhibit 24.

10. The court sustained preliminary objections to Resource's initial complaint in the subrogation action, in response to which Resource filed a satisfactory amended complaint.

## I. *The Release Does Not Bar Resource's Claims in the Subrogation Action*

The LLOT defendants first argue that the release in the 1991 resolution agreement precludes Resource from pursuing the subrogation action. Generally, a release is to be given effect according to the ordinary meaning of its language. *Seasor v. Covington,* 447 Pa. Super. 543, 547, 670 A.2d 157, 159 (1996). It must also be construed narrowly and in light of the circumstances at the time of its execution:

"The courts of Pennsylvania have traditionally . . . interpreted the release as covering only such matters as can fairly be said to have been within the contemplation of the parties when the release was given. . . . Moreover, releases are strictly construed so as not to bar the enforcement of a claim which had not accrued at the date of the execution of the release.

"[A] release covers only those matters within the parties' contemplation. In construing this general release, a court cannot merely read the instrument . . . . [I]t is crucial that a court interpret a release so as to discharge only those rights intended to be relinquished. The intent of the parties must be sought from a reading of the entire instrument, as well as from the surrounding conditions and circumstances." *Vaughn v. Didizian,* 436 Pa. Super. 436, 439, 648 A.2d 38, 40 (1994). (citations and quotation marks omitted) See also, *Harrity v. Medical College of Pennsylvania Hospital,* 439 Pa. Super. 10, 22-23, 653 A.2d 5, 11-12 (1994) (focusing on limiting language in release and declining to apply release).

In the release, executed in 1991, Radnor released the "Growth group"[11] from the following:

"[A]ny and all actions, causes of actions, proceedings, claims, demands, counterclaims, offsets, deductions, damages, costs, liabilities, agreements, and obligations of any nature whatsoever, whether contingent or matured, known or unknown, in law or equity, asserted or which might have been asserted, directly or indirectly sustained by any of them arising out of or connected with any one or more of the following: . . .

"(d) the purchase, financing, construction, operation or ownership of the [property], and

"(e) any other relationship between the Radnor group, or any of them or their affiliates, and the Growth group, or any of them or their affiliates." Exhibit 8 at 5.

While this language applies broadly to the then-current disputes, there is no indication that the release was intended to cover future defaults, including the LLOT defendants' default in December 1994. Rather, the release appears to focus on addressing Radnor's allegations of default in 1991 and the Growth group's defenses to those allegations.[12] Thus, the release does not bar Re-

---

11. The "Growth group" is defined as Growth, Growth Services Inc. and G-L. Thus, it is unclear why the release, even if applicable, would bar claims against LLOT.

12. To provide context to the release, the resolution agreement states that "Radnor has asserted that Growth properties is in default under the loan agreement and the notes," and that the "Growth group has asserted certain defenses and offsets to the defaults asserted by . . . Radnor." Exhibit 8 at ¶¶F, G. The resolution agreement also makes reference to an action brought by Sheridan against Growth Services Inc. *Id.* at ¶F.

sources from pursuing its current claims against the LLOT defendants.

## II. *The Defendants Are Not Entitled to Summary Judgment on Resource's Unjust Enrichment Claim*

The LLOT defendants present two arguments in support of their motion for summary judgment on Resource's unjust enrichment claim. First, they assert that Resource's claim is barred by the statute of limitation. Second, they contend that Resource lacks standing to bring an unjust enrichment claim in Radnor's name because the scope of Radnor's assignment to Resource does not include this type of claim. Neither argument has merit.

In Pennsylvania, unjust enrichment/quantum meruit actions are governed by the four-year statute of limitations. *Cole v. Lawrence,* 701 A.2d 987, 989 (Pa. Super. 1997); *Bednar v. Marino,* 435 Pa. Super. 417, 427, 646 A.2d 573, 578 (1994). Such actions "begin to accrue as of the date on which the relationship between the parties is terminated." *Cole,* 701 A.2d at 989.

Neither Resource nor the LLOT defendants address the termination of the relationship between Radnor and the LLOT defendants. See Resource's memorandum at 14 (focusing on "the breach of the implied contract or repayment between [Radnor] and the LLOT defendants"); LLOT defendants' memorandum at 16 (focusing on the "behavior or event alleged by plaintiff to have resulted in the LLOT defendants' 'unjust enrichment' "). This leaves the court without facts to support a finding that the relationship between the LLOT defendants and Radnor was terminated more than four years before the

subrogation action was filed. As a result, the subrogation action cannot, at present be dismissed based on the statute of limitations.

The LLOT defendants also contend that Radnor did not assign its unjust enrichment claim to Resource. An assignment "will ordinarily be construed in accordance with the rules of construction governing contracts and the circumstances surrounding the execution of the assignment document." *Horbal v. Moxham National Bank,* 548 Pa. 394, 406, 697 A.2d 577, 583 (1997) (per Castille, J., with two justices concurring) (citing *U.S. National Bank v. Campbell,* 354 Pa. 483, 47 A.2d 697 (1946)). The assignment provision in the Radnor absolute assignment states that Radnor "absolutely, unconditionally and unequivocally sells, assigns, and transfers to the assignee [Resource], all of its present and future right, title, interest in and to the notes and the mortgages and all payments due or to become due thereunder and all proceeds thereof." Exhibit 22 at ¶1. Even if this provision does not specifically reference an action in quantum meruit or for unjust enrichment,[13] Resource alleges that Radnor's

---

13. No Pennsylvania case has addressed whether the assignment of contractual rights includes an assignment of causes of action arising from those rights, and there is no consensus among courts in other jurisdictions on this issue. Compare *National Reserve Co. of Amer. v. Metropolitan Trust Co. of Cal.,* 112 P.2d 598, 602 (Cal. 1941) (an unqualified assignment of a contract vests in the assignee the assigned contract and all incidental rights and remedies including "certain ancillary causes of action arising out of the subject of the assignment and accruing before the assignment is made") and *Allianz Life Ins. Co. of N. Amer. v. Riedl,* 444 S.E.2d 736, 738 (Ga. 1994) ("[i]n the absence of a contrary intention, an assignment usually passes as incidents all ancillary remedies and rights of action which the assignor had or would have had for the enforcement of the right or chose assigned") with

conduct implies that it assigned its unjust enrichment claim and that Resource's prosecution of the claim is proper. Resource's memorandum at 14-16. At the least, these allegations present an issue of material fact as to the assignment of Radnor's unjust enrichment cause of action, preventing the court from granting summary judgment on Resource's claim.

### III. *The Defendants Have Not Established That Resource Cannot Sustain its Equitable Subrogation Claim*

Pennsylvania law recognizes the doctrine of equitable subrogation and defines it as "the substitution of one entity in the place of another with reference to a lawful claim, demand, or right, so that he who is substituted succeeds to the rights of the other in relation to the debt or claim, and its rights, remedies or securities." *Public Service Mutual Insurance Co. v. Kidder-Friedman,* 743 A.2d 485, 488 (Pa. Super. 1999) (quoting *Molitoris v. Woods,* 422 Pa. Super. 1, 9, 618 A.2d 985, 989 (1992)). This doctrine is "a means of placing the ultimate burden of a debt upon the one who in good conscience ought to

---

*Royal Mort. Corp. v. Federal Deposit Ins. Corp.,* 20 F. Supp.2d 664, 667-68 (S.D.N.Y. 1998) ("when a party to a loan agreement assigns its contract rights in the agreement, ancillary rights of action that arise out of the agreement are not automatically transferred, but may be assigned as part of the overall agreement") and *Tycon Tower I Inv. Ltd. Partnership v. John Burgee Architects,* 651 N.Y.S.2d 637, 639 (N.Y. App. Div. 1996) (assignment of contractual rights did not include assignment of causes of action for fraud or negligent misrepresentation related to those rights). Cf. *Phillips v. Bank of Lewiston,* 18 Pa. 394 (1852) (assignee is entitled also to all remedies which the assignor had, although they are not specifically mentioned in the assignment).

pay it, and is generally applicable when one pays out of his own funds a debt or obligation that is primarily payable from the funds of another." *High-Tech-Enterprises Inc. v. General Accident Insurance Co.,* 430 Pa. Super. 605, 609, 635 A.2d 639, 642 (1993). (citation omitted) Equitable subrogation will not be permitted until the creditor is fully paid. *Stofflett v. Kress,* 342 Pa. 332, 336, 21 A.2d 31, 33 (1941) ("until [the superior creditor] is fully paid subrogation cannot be allowed on any terms whatever"); *Hagans v. Constitution State Service Co.,* 455 Pa. Super, 231, 240, 687 A.2d 1145, 1149 (1997) ("subrogation presupposes an actual payment and satisfaction of a debt or claim by the entity asking to be subrogated").[14]

The LLOT defendants contend that, under the 1991 resolution agreement, Radnor had "no subrogation rights or interests in the second note or the third note unless [it] satisfied the entire" purchase price. LLOT defendants' memorandum at 19. Even if this assertion is correct, it appears that Resource, as Radnor's assignee and in its own right, has satisfied the entire purchase price. In exchange for CoreStates' rights in the second notes, Resource paid approximately $3.6 million, which represented the total amount of the balance outstanding on

---

14. The four other elements of a successful equitable subrogation claim are:

"(1) The claimant paid the creditor to protect his own interests;

"(2) The claimant did not act as a volunteer;

"(3) The claimant was not primarily liable for the debt; and

"(4) Allowing subrogation will not cause injustice to the rights of others. *Tudor Development Group Inc. v. United States Fidelity & Guaranty Co.,* 968 F.2d 357, 362 (3d Cir. 1992) (citing *United States Fidelity & Guaranty Co. v. United Penn Bank,* 362 Pa. Super. 440, 524 A.2d 958 (1987)).

the notes. Exhibit 17 at ¶2(a). More importantly, Resource succeeded to all of Radnor's subrogation rights in the second and third notes, including any credit for satisfaction through its payment of the collateral. Exhibit 21 at ¶5. Through its inheritance of Radnor's satisfaction rights and its own payment of the outstanding balance on the notes, Resource could be considered to have satisfied both the second and third notes.

This conclusion is bolstered by language elsewhere in the settlement and transfer documents. These documents indicate that all parties believed that Resource had obtained Radnor's subrogation rights to the second and third notes, implicitly recognizing that Radnor had satisfied the LLOT defendants' obligations under the notes. See exhibit 31 at ¶3 (securing Resource's indemnification obligations to CoreStates with Radnor and its successor's subrogation rights in the second and third notes); exhibit 33 at ¶C (recognizing Radnor's interest in the notes and mortgages); exhibit 20 at ¶C (same); exhibit 23 at ¶A (recognizing that Radnor is the holder of subrogation rights in the second and third notes). As a result, the LLOT defendants are not entitled to summary judgment on Resource's equitable subrogation claim.[15]

---

15. To the extent that the LLOT defendants argue that Resource's claims are based on contractual subrogation, as opposed to equitable subrogation, the court notes that Pennsylvania law does not impose a distinction between the two. See *Mellon Bank N.A. v. National Union Insurance Co. of Pittsburgh, PA,* 768 A.2d 865, 871 (Pa. Super. 2001) ("subrogation is equitable in nature regardless of any applicable contractual language"); *Cullen v. Pennsylvania Property and Casualty Insurance Guaranty Association,* 760 A.2d 1198, 1200 n.7 (Pa. Commw. 2000) (the principles behind equitable and contractual subrogation are the same).

## IV. *The LLOT Defendants Are Not Entitled to Summary Judgment in the Confession Action*

Finally, the LLOT defendants assert that they are entitled to summary judgment in the confession action because the third note was paid in full and because Radnor had no rights under the third note. These arguments are without merit.

As an initial matter, Resource is pursuing the confession action as a successor in interest to CoreStates, not Radnor. Exhibit 25 at ¶1. Thus, any limitation on Radnor's third note rights is irrelevant. With regard to the full payment of the third note obligation, the parties appear to disagree as to the factual question of how the collateral has been applied, and neither side cites any case law in support of its legal arguments.[16] Resource's memorandum at 23 n.15; LLOT defendants' memorandum at 23. As a result, the LLOT defendants are not entitled to summary judgment in the confession action.

## CONCLUSION

Because genuine issues of material fact remain outstanding, the LLOT defendants are not entitled to summary judgment. The motion will be denied. The court will enter a contemporaneous order consistent with this opinion.

---

16. Specifically, neither memorandum cites any case, from Pennsylvania or otherwise, on whether an equitable subrogee's satisfaction of a debt for the purposes of equitable subrogation is the equivalent of satisfying the debt for confession of judgment purposes.

## ORDER

And now, June 5, 2001, upon consideration of the motion for summary judgment of defendants LLOT Inc. and Growth Properties Ltd.-LLOT General Partnership, the opposition to it of plaintiff Resource Properties XLIV Inc., in its own right and as successor in interest to Radnor Financial Group Inc. and CoreStates Bank, the respective memoranda, all other matters of record, and in accord with the opinion being filed contemporaneously with this order, it is ordered that the motion for summary judgment is denied.