PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-3289
_____

HARTIG DRUG COMPANY INC., on behalf of itself
and all others similarly situated,
                                        Appellant

v.

SENJU PHARMACEUTICAL CO. LTD.; KYORIN
PHARMACEUTICAL CO. LTD.;
ALLERGAN INC.
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-14-cv-00719)
District Judge:  Hon. Sue L. Robinson
_____

Argued
June 13, 2016

Before:   AMBRO, JORDAN, and GREENBERG, <u>Circuit</u>
<u>Judges</u>

(Filed: September 7, 2016)

_____

J. Clayton Athey
Prickett Jones & Elliott
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

Brent W. Landau   [ARGUED]
Hausfeld
325 Chestnut – Ste. 900
Philadelphia, PA 19106

     *Counsel for Appellant*

Stephen B. Brauerman
The Bayard Firm
222 Delaware Avenue – Ste. 900
Wilmington, DE 19801

William F. Sondericker
Carter Ledyard & Milburn
2 Wall Street
New York, NY 10005

     *Counsel for Appellee Senju Pharmaceutical Co. Ltd.*

Sara Kusiak
Jones Day
250 Vesey Street
New York, NY 10281

Rosanna K. McCalips
Kevin D. McDonald
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001

David E. Ross
Benjamin J. Schladweiler
Ross Aronstam & Moritz
100 South West Street - #400
Wilmington, DE   19801

     *Counsel for Kyorin Pharmaceutical Co. Ltd.*

Ashley E. Johnson
M. Sean Royall   [ARGUED]
Gibson Dunn & Crutcher
2100 McKinney Avenue – Ste. 1100
Dallas, TX 75201

Mark A. Perry
Lucas C. Townsend
Gibson Dunn & Crutcher
1050 Connecticut Avenue, NW – 9th Fl.
Washington, DC  20036

     *Counsel for Appellee Allergan Inc.*

Scott E. Perwin
Kenny Nachwalter
1441 Brickell Avenue – Ste. 1000
Miami, FL   33131

*Counsel for Amicus Appellants*
*Walgreen Co., Safeway, Inc., Kroger Co.,*
*HEB Grocery Co. LP, Albertsons LLC*


Barry L. Refsin
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
18th & Cherry Sts. – 27th Fl.
Philadelphia, PA   19103

   *Counsel for Amicus Appellant*
   *Rite Aid Corp.*

_____

OPINION OF THE COURT
_____


JORDAN, <u>Circuit Judge</u>


   This appeal arises from a putative class action in which Hartig Drug Company Inc. ("Hartig") filed a complaint against Senju Pharmaceutical Co., Ltd. ("Senju"), Kyorin Pharmaceutical Co., Ltd. ("Kyorin"), and Allergan Inc. ("Allergan") (collectively, the "Defendants"), alleging antitrust violations involving medicated eyedrops manufactured by the Defendants.  Hartig argues that the Defendants' wrongful suppression of generic competition resulted in supracompetitive pricing of those eyedrops. Although not a direct purchaser of the medications, Hartig claims it has standing to sue because of an assignment of

rights from AmerisourceBergen Drug Corporation ("Amerisource") which is a direct purchaser.

The District Court dismissed Hartig's complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. In its opinion, the Court ruled that an anti-assignment clause in a distribution agreement between Allergan and Amerisource barred any assignment of antitrust claims from Amerisource to Hartig, leaving Hartig without standing to sue and divesting the Court of subject matter jurisdiction. We conclude that the District Court erred in treating antitrust standing as an issue of subject-matter jurisdiction. Accordingly, we will vacate and remand for further proceedings.

## I. BACKGROUND

### A. Factual Background[1]

Kyorin researchers developed an antibiotic called gatifloxacin and, in 1990, were awarded a patent on the drug. In 1997, Kyorin licensed Senju to develop, manufacture, and commercialize ophthalmic solutions containing gatifloxacin. Later, in 2001, Senju researchers obtained U.S. Patent No. 6,333,045 (the "'045 Patent") claiming aqueous liquid pharmaceutical compositions containing gatifloxacin and

---

[1] As explained in greater detail hereafter, it was error for the District Court to dismiss the action under Rule 12(b)(1). Treating the motion to dismiss as one under Rule 12(b)(6), we recount the facts as alleged by the non-movant, Hartig, accepting them as true. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

5

methods of utilizing them. The named inventors on that patent assigned their rights to Kyorin and Senju jointly.

Kyorin and Senju also "licensed to Allergan the right – including a license under the '045 [P]atent – to market aqueous liquid gatifloxacin ophthalmic products in the United States." (A33.) Allergan filed New Drug Applications ("NDAs") with the Food and Drug Administration for a 0.3% gatifloxacin solution (branded "Zymar"), and for a 0.5% gatifloxacin solution (branded "Zymaxid"); those NDAs were approved in 2003 and 2010 respectively. Amerisource subsequently began purchasing Zymar and Zymaxid eyedrops directly from the Defendants and selling them to Hartig, an Iowa-based drug store chain.

Hartig alleged that the Defendants engaged in a number of illegal practices to prevent or delay the introduction into the market of generic alternatives to Zymar and Zymaxid.[2] First, the Defendants filed a baseless lawsuit against another pharmaceutical company, Apotex, claiming patent infringement and delaying FDA approval of that company's generic version of Zymar. Next, the Defendants engaged in so-called "product hopping" (A35) – discouraging doctors from prescribing generic alternatives to the original 0.3% Zymar eyedrops by phasing out that product in favor of "new" 0.5% Zymaxid eyedrops. To buy time for that shift in marketing strategy, the Defendants prolonged the Apotex

_____

[2] We deliberately refer to the Defendants collectively in describing the alleged anticompetitive conduct, as Hartig claims that all the Defendants, and not merely Allergan, engaged in such conduct.

litigation by filing a frivolous motion for a new trial. They also asked the United States Patent and Trademark Office to reexamine claims of the '045 Patent, but failed to disclose material information both from the trial record in the Apotex case and from their own expert that undermined their reexamination claims. After the FDA approved Apotex's 0.3% gatifloxacin eyedrops, the Defendants sued Apotex a second time. Although the courts ultimately held that the Defendants' suit was barred by claim preclusion, Apotex was deterred from launching a generic competitor to Zymar. Since then, the Defendants have filed numerous lawsuits against competing drug manufacturers to bar the market entry of generic equivalents to both Zymar and Zymaxid.

B.     **Procedural Background**

Hartig filed its complaint in the United States District Court for the District of Delaware on June 6, 2014. Styled as a class action, the complaint alleged that, were it not for the Defendants' violations of the Sherman Antitrust Act, generic versions of the gatifloxacin eyedrops would have been sold after Kyorin's patent on gatifloxacin expired in 2010.[3] Hartig alleged that the "Defendants' unlawful scheme effectively denied direct purchasers of Zymar and Zymaxid the benefits

_____

[3] The complaint alleges that Apotex, when it filed its Abbreviated New Drug Application ("ANDA") for a 0.3% gatifloxacin ophthalmic solution, certified that it would not market that product until Kyorin's patent expired on June 15, 2010, and Apotex notified the Defendants that its proposed ANDA product would not infringe on any valid claim of the separate '045 Patent. The complaint also alleges that the Defendants knew that the claims of the '045 Patent were invalid as obvious.

7

of competition and of less expensive, generic versions.  As a result, [Hartig] and members of the Class … have paid supracompetitive prices for Zymar and Zymaxid and [Zymaxid's] generic equivalent[]."[4]  (A24.)

The complaint acknowledged that Hartig was only an indirect purchaser of the two gatifloxacin products and that Hartig obtained the products through Amerisource, a direct purchaser.  That point was – and is – significant because, under the so-called "direct purchaser rule" recognized in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), a direct purchaser of a product has standing to sue under federal antitrust statutes whereas an indirect purchaser does not.  Nevertheless, the complaint alleged that Amerisource had entered an assignment agreement with Hartig that

> conveyed, assigned, and transferred to Hartig all of its rights, title and interest in and to all causes of action it may have against Defendants under the antitrust laws of the United States or of any state arising out of or relating to Amerisource's purchase of Zymar and Zymaxid to the extent

---

[4]  Specifically, Hartig alleged that "Defendants' anticompetitive actions delayed the entry of any generic competition from the market for over three years (at least from June 15, 2010 until October 3, 2013), and has limited generic competition even today to a single generic competitor offering a generic to Zymaxid only."  (A48.)

8

> such product was subsequently resold to Hartig … .[5]

(A24-25 ¶ 9.)

Allergan responded to Hartig's suit by filing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. Kyorin and Senju jointly filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.[6] Allergan's 12(b)(1) motion argued that Hartig lacked "[s]tanding to sue under the antitrust laws" because an anti-assignment clause in the Distribution Services Agreement ("DSA") that Allergan had with Amerisource expressly prohibited either party from assigning the agreement or related rights and obligations without prior written consent from the other party. *Hartig v. Senju, et al.*, D. Del., CA No. 14-719-SLR Docket Item

---

[5] The Defendants contend that Hartig failed to establish the existence of the assignment agreement. Because, as we ultimately conclude, the District Court should have considered Allergan's motion to dismiss under Rule 12(b)(6) rather than Rule 12(b)(1), the Court was obligated to accept the complaint's factual allegations as true and view them in the light most favorable to Hartig. *See Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014). Thus, even without the introduction of a written copy of the assignment agreement, the complaint's allegation that an assignment of antitrust rights had occurred suffices at this stage of the proceedings.

[6] Allergan subsequently joined that 12(b)(6) motion as well.

("D.I.") 15, at 4; *see id.*, at 5-9. The DSA is not mentioned in Hartig's complaint, but it was appended to Allergan's motion to dismiss as an exhibit to a declaration from one of Allergan's corporate officers, a Mr. Kafer. The anti-assignment clause of the DSA provides as follows:

> This Agreement may not be assigned by either party without the prior written consent of the other party. Notwithstanding the foregoing, either party may assign its rights and obligations hereunder without the consent of the other party to a subsidiary or affiliate or to an entity which purchases all or substantially all of the assigning party's stock or assets or acquires control of the assigning party, whether by merger, consolidation or any other means.

(A108-109 § 14.b.) The Kafer declaration stated that Hartig was not a direct purchaser from Allergan and that Amerisource had not sought or obtained written consent from Allergan for the alleged assignment, as purportedly required by the DSA's anti-assignment clause.

After briefing on both the 12(b)(1) and 12(b)(6) motions, the District Court granted Allergan's 12(b)(1) motion and, in an order dated August 19, 2015, dismissed the action for lack of subject matter jurisdiction. The District Court relied on the anti-assignment clause in the DSA to conclude that Hartig lacked standing, reasoning that the clause's prohibition applied to antitrust claims and therefore barred the assignment of the very claims on which Hartig's standing relied. Hartig timely appealed. Later, a group of

10

seven drug retailers joined the appeal as *amici curiae* in support of Hartig.[7]

## II. DISCUSSION[8]

### A. The Appropriateness of Review under Rule 12(b)(1)

The parties have not challenged the District Court's decision to address antitrust standing as a question of subject matter jurisdiction. Rather, it is the *amici* who contend that Allergan's anti-assignment argument implicated only antitrust standing and that such standing is different from Article III standing, so that the District Court's subject matter jurisdiction has never been rightly in question.

An *amicus* normally "cannot expand the scope of an appeal with issues not presented by the parties on appeal," *Nuveen Mun. Tr. ex rel. Nuveen High Yield Mun. Bond Fund*

---

[7] The *amici* are Walgreen Co., The Kroger Co., Safeway Inc., Albertson's LLC, HEB Grocery Company LP, CVS Health Corporation, and Rite Aid Corporation.

[8] The District Court's subject matter jurisdiction is the primary issue in this appeal. We have appellate jurisdiction to review the final decision of the District Court pursuant to 28 U.S.C. § 1291. The question of whether the District Court had subject matter jurisdiction is an issue of law that we review *de novo*. *In re Phar-Mor, Inc. Sec. Litig.*, 172 F.3d 270, 273 (3d Cir. 1999). Likewise, the determination of a contract's legal effect is a question of law subject to plenary review. *Ram Constr. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1053 (3d Cir. 1984).

*v. WithumSmith Brown, P.C.*, 692 F.3d 283, 300 n.10 (3d Cir. 2012), at least not "in cases where the parties are competently represented by counsel," *id.* (quoting *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445 (2d Cir. 2001)). And yet, federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *see also id.* (affirming that "subject matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived") (internal quotation marks omitted). A court's non-waivable obligation to inquire into its own jurisdiction is most frequently exercised in the negative – that is, by questioning whether federal jurisdiction exists even when all parties assume that it does. But "federal courts [also] have a strict duty to exercise the jurisdiction that is conferred upon them by Congress," *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996), and "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not," *id.* (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)). "[S]ubject-matter delineations must be policed by the courts on their own initiative," irrespective of whether that policing of jurisdictional authority is voiced in the positive or the negative. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). Thus, regardless of the acquiescence or wishes of the parties, we must question whether the District Court properly treated antitrust standing as a jurisdictional issue under Rule 12(b)(1).

We recently confronted a similar jurisdictional issue – presented in a similar posture – in *Group Against Smog and Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116 (3d Cir. 2016). In that case, the District Court treated the "diligent

12

prosecution" bar of 42 U.S.C. § 7604(b)(1)(B) as a limitation on its subject matter jurisdiction, and therefore dismissed the action under Rule 12(b)(1). *Id.* at 121. On appeal, *amici curiae* "raise[d] the issue of whether the diligent prosecution bar is jurisdictional and appropriately decided through a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, or whether the diligent prosecution bar is nonjurisdictional and should be decided through a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Id.* at 122. We noted that the appellants themselves had not raised that argument but had proceeded under the assumption that the bar was jurisdictional. *Id.* at 122 n.5. Nevertheless, we affirmed our independent obligation to "raise and decide jurisdictional questions that the parties either overlook or elect not to press," *id.* (quoting *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011)), an obligation made all the more significant because "branding a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system," *id.* at 122 (internal quotation marks and brackets omitted). We ultimately concluded that the District Court erred in treating the diligent prosecution bar as a jurisdictional limitation, and therefore should have dealt with the motion to dismiss under Rule 12(b)(6) rather than Rule 12(b)(1). *Id.* at 132.

Similarly, the *amici* here argue that the District Court erred by addressing Allergan's motion to dismiss as a factual challenge to jurisdiction under Rule 12(b)(1), and that the Court should have addressed the motion under Rule 12(b)(6) for failure to state a claim. The distinction between Rules 12(b)(1) and 12(b)(6) is important because the 12(b)(6) standard affords significantly more protections to a nonmovant. "In deciding a Rule 12(b)(6) motion, a court …

consider[s] only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Moreover, the court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the nonmovant." *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 154 n.1 (3d Cir. 2014) (quotation marks and citations omitted).

A Rule 12(b)(1) attack can be a very different matter. A facial 12(b)(1) challenge, which attacks the complaint on its face without contesting its alleged facts, is like a 12(b)(6) motion in requiring the court to "consider the allegations of the complaint as true." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (internal quotation marks omitted). But a factual 12(b)(1) challenge attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts. *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). When considering a factual challenge, "the plaintiff [has] the burden of proof that jurisdiction does in fact exist," the court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "no presumptive truthfulness attaches to [the] plaintiff's allegations … ." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). And, when reviewing a factual challenge, "a court may weigh and consider evidence outside the pleadings." *Constitution Party of Pa.*, 757 F.3d at 358 (internal quotation marks omitted). Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and

14

factual deference provided under 12(b)(6) review.  *See, e.g., Davis v. Wells Fargo*, 824 F.3d 333, 348-50 (3d Cir. 2016).

In arguing the motions to dismiss in the District Court, no one questioned whether Allergan's attack on Hartig's antitrust standing should have been brought under Rule 12(b)(6) instead of as a matter of subject-matter jurisdiction under Rule 12(b)(1).  As mentioned above, it is the *amici* who have raised the question on appeal.  Remarkably, Hartig neglects to address the argument at all, except to acknowledge that the *amici* have raised it.  Even at oral argument, when squarely faced with the question, Hartig's counsel did not ask for consideration under 12(b)(6) but voiced an apparent preference to confront Allergan's 12(b)(1) challenge head-on – that is, by reaching the issue of whether the DSA precluded the assignment of Amerisource's antitrust causes of action.  Nevertheless, in keeping with our independent obligation to consider the boundaries of subject matter jurisdiction, we conclude that the District Court should have treated antitrust standing not as an Article III jurisdictional issue, but rather as a merits issue, and thus should have resolved the motion to dismiss under Rule 12(b)(6) rather than Rule 12(b)(1).

### B.  Article III Standing versus Antitrust Standing

To meet the "irreducible constitutional minimum" of Article III standing, a plaintiff invoking federal jurisdiction bears the burden of establishing three elements, as set forth in the now familiar case of *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  First, it must establish that it has suffered an "injury in fact," meaning a concrete and

15

particularized invasion of a legally protected interest. *Id*. Second, it must establish a "causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id*. (internal quotation and editorial marks omitted). Third, it must show a likelihood "that the injury will be redressed by a favorable decision." *Id*. at 561 (internal quotation marks omitted). Article III standing is essential to federal subject matter jurisdiction and is thus "a threshold issue that must be addressed before considering issues of prudential standing." *Miller v. Nissan Motor Acceptance Corp.*, 362 F.3d 209, 221 n.16 (3d Cir. 2004) (citation omitted).

In a case like this, even after a plaintiff has established Article III standing, antitrust standing remains as a prerequisite to suit, "'focus[ing] on the nature of the plaintiff's alleged injury,' [and] asking 'whether it is of the type that the antitrust statute was intended to forestall.'" *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997) (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538, 540 (1983)).

> If the injury is not of the requisite type, even though the would-be plaintiff may have suffered an injury as a result of conduct that violated the antitrust laws, he or she has no standing to bring a private action under the antitrust laws to recover for it. … Therefore, the plaintiff might be able to sue under a different statute or common law rule … but the plaintiff [would

have] no standing to sue under the antitrust laws.

*Id.*

That Article III standing and antitrust standing both employ the term "standing" tends to confuse matters. The two concepts are distinct, with the former implicating a court's subject matter jurisdiction and the latter affecting only the plaintiff's ability to succeed on the merits. In *Ethypharm S.A. France v. Abbott Laboratories*, we explained that Article III standing is of constitutional and hence jurisdictional consequence, while antitrust standing is not:

> Constitutional standing is augmented by consideration of prudential limitations. For plaintiffs suing under federal antitrust laws, one of the prudential limitations is the requirement of antitrust standing. It does not affect the subject matter jurisdiction of the court, as Article III standing does, but prevents a plaintiff from recovering under the antitrust laws.

707 F.3d 223, 232 (3d Cir. 2013) (internal quotation marks, footnotes, and citations omitted). The difference between Article III standing and antitrust standing is apparent from the Supreme Court's explanation of the direct purchaser rule in *Illinois Brick*, which recognized that, although indirect purchasers "may have been actually injured by antitrust violations" through passed-on overcharges, the "legislative purpose[s]" underlying the antitrust statutes would still be better served by limiting recovery to the direct purchasers paying those overcharges in the first instance. 431 U.S. at 746; *see generally id.* at 737-47. Thus, the direct purchaser rule represents a policy decision intended to aid the purposes

of the antitrust statutes and does not speak to whether there is an Article III case or controversy.

Sometimes antitrust standing is discussed in terms of "statutory standing." *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 307 n.35 (3d Cir. 2011) (en banc) (clarifying that the term "statutory standing" refers "to the possession of a viable claim or right to relief, not to a jurisdictional requirement"). Again, however, labels can be misleading. A lack of "statutory standing" means the absence of a valid cause of action under a statute, but it "does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014) (original emphasis) (internal quotation marks omitted). "Accordingly, statutory standing is simply another element of proof for an antitrust claim, rather than a predicate for asserting a claim in the first place." *Sullivan*, 667 F.3d at 307. In the end, it does not matter "whether the [antitrust] standing inquiry is characterized as 'prudential' or 'statutory' … because neither deprives us of Article III jurisdiction and both bar a plaintiff's ability to recover." *Ethypharm*, 707 F.3d at 232 n.17.

At oral argument before us, the Defendants continued to press the position that the DSA's anti-assignment clause implicated Article III standing. But that is simply not so. Allergan's motion to dismiss under Rule 12(b)(1) was always premised, at bottom, on Hartig's purported lack of antitrust standing. True, Allergan framed its 12(b)(1) motion in terms of Article III standing, referring to the "case-or-controversy requirement of Article III." D.I. 15, at 4 (quoting *Lujan*, 504 U.S. at 560). But the substance of Allergan's argument

18

focused solely on the Supreme Court's holding in *Illinois Brick* that an indirect purchaser lacks "[s]tanding to sue under the antitrust laws."[9] *Id.*

We have repeatedly interpreted *Illinois Brick* and its progeny as addressing not the threshold question of whether an indirect purchaser has Article III standing to sue in federal court at all, but rather the subsequent question of whether such a purchaser has standing to recover under federal antitrust statutes. *See, e.g., Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 79 (3d Cir. 2011) ("In *Illinois Brick*, the Supreme Court held that only direct purchasers have standing under Section 4 of the Clayton Act."); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 366 n.2 (3d Cir. 2005) ("*Illinois Brick* determined that direct purchasers are the only parties 'injured' in a manner that permits them to recover damages. It thus held that indirect purchaser plaintiffs do not have statutory standing to recover damages under Section 4 of the Clayton Act.") (internal citations omitted); *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 963 (3d Cir. 1983) (identifying *Illinois Brick* as

---

[9] Indeed, Allergan's legal argument on this point was as follows:

> Standing to sue under the antitrust laws is limited to parties that were direct purchasers of the product at issue. *Ill. Brick*, 431 U.S. at 746. Indirect purchasers – that is, parties who allegedly paid an overcharge that was passed on by a party that made a purchase directly from the defendants – lack standing.

D.I. 15, at 4-5.

19

recognizing "that there are certain classes of plaintiffs who, although able to trace an injury to an antitrust violation, are generally not within the group of private attorneys general Congress created to enforce the antitrust laws under section 4") (internal quotation marks omitted).

Forced to confront the distinction between constitutional and antitrust standing, the Defendants now attempt to change the discussion by arguing that Hartig's assertion of antitrust standing via assignment was actually a fatal misstep, somehow undermining its ability to establish constitutional standing. In a supplemental filing, they endeavor to reformulate the arguments that Allergan made in the 12(b)(1) motion in the District Court, saying,

> Had Hartig sued for its *own* injury – the alleged overcharge it paid to Amerisource – Allergan would have moved to dismiss for lack of antitrust standing under Rule 12(b)(6). Because Hartig sued for *someone else's injury* – the alleged overcharge paid by Amerisource – Allergan properly moved under Rule 12(b)(1) advancing a constitutional standing argument.

(Defendants' Letter Dated June 24, 2016, at 2.) This is a wholly new argument. Allergan's motion to dismiss was always premised upon Hartig's lack of antitrust standing as an indirect purchaser, which was an *Illinois Brick* argument and not a constitutional challenge to standing. *See* D.I. 15, at 4-5 ("Indirect purchasers … lack standing." (citing *Illinois Brick*, 431 U.S. at 746)); *see also id.* at 5 n.1 (urging that, even if the District Court were to consider Allergan's motion under Rule 12(b)(6), the Court could still consider the DSA "in deciding

20

whether Hartig satisfies the *indispensable element of antitrust standing*" (emphasis added)).

But, even ignoring that none of the Defendants previously made the argument that the assignment from Amerisource to Hartig created a problem of constitutional magnitude, the substance of the Defendants' new argument is unpersuasive. For purposes of constitutional standing, the underlying questions raised by the argument are captured in the first two of the well-known *Lujan* factors.[10] In particular, those questions are whether Hartig has suffered an injury in fact and whether that injury is fairly traceable to the Defendants. On these matters, the distinction between direct and indirect purchasers is of little relevance.[11]

Hartig certainly has alleged such an injury. Its complaint asserted that it bought Zymar and Zymaxid from Amerisource, which in turn purchased those products from the Defendants. (A24-25.) Thus, notwithstanding that the "direct purchaser rule" from *Illinois Brick* would disqualify Hartig from serving as a private attorney general under the

---

[10] The third element from *Lujan*, redressibility, is not raised by the Defendants' new Article III standing argument.

[11] We are careful not to say that the distinction between direct and indirect purchasers is wholly irrelevant to the question of Article III standing, since an indirect purchaser could be so remote as to be unable to meet its burden of establishing either that it had suffered an injury in fact or that such injury was fairly traceable to the defendant's actions.

21

antitrust statutes,[12] Hartig's allegations are that it was in fact harmed by the downstream effects of the Defendants' anticompetitive behavior. Indeed, while the Defendants argued that Hartig did not assert its own injuries, in the same breath they recognized that Hartig has "alleged" it paid "overcharge[s]" for the Zymar and Zymaxid products. (Defendants' Letter Dated June 24, 2016, at 2.) The complaint plainly and repeatedly emphasizes that, as a result of the Defendants' anticompetitive behavior in suppressing generic equivalents of Zymar and Zymaxid, Hartig has paid inflated prices for those products.[13] Those allegations,

---

[12] That disqualification may or may not be overcome by the alleged assignment from Amerisource. That is a question for the District Court in the first instance.

[13] *See* A24 ¶ 8 ("Defendants' unlawful scheme effectively denied direct purchasers of Zymar and Zymaxid the benefits of competition and of less expensive, generic versions. As a result, Plaintiff [Hartig] … ha[s] paid supracompetitive prices for Zymar and Zymaxid and its generic equivalents."); A48 ¶ 124 ("Defendants' anticompetitive actions resulted in Plaintiff [Hartig] … paying higher prices for gatifloxacin ophthalmic formulations than [it] would have paid if a generic equivalent to Zymar and Zymaxid had been available throughout the class period."); A51 ¶ 141 (same); A50 ¶¶ 136-37 (alleging that, "[a]s a result of the Defendants' illegal conduct," Hartig and other "purchasers of Zymar and Zymaxid have sustained substantial losses and damage to their business and property in the form of overcharges"); A52 ¶ 143 (asserting that, "as a direct and proximate result of Defendants' wrongful conduct," Hartig and other class members "paid artificially inflated prices for

together with the complaint's specific descriptions of anticompetitive behavior indulged in by the Defendants, are sufficient to establish a judicially redressable injury-in-fact that is fairly traceable to the Defendants – or, in other words, an Article III case or controversy.

We recognize that the conflation of Article III standing with antitrust standing may arise, at least in part, from those doctrines' overlap in both the factual questions they can involve and in their terminology.  Nevertheless, we again caution against expanding Rule 12(b)(1) "beyond its proper purpose," and reaffirm that, in general, "Rule 12(b)(6) – with its attendant procedural and substantive protections for plaintiffs – is the proper vehicle for the early testing of a plaintiff's claims."  *Davis*, 824 F.3d at 348-49.[14]  As we

---

Zymar and Zymaxid and were deprived of the benefits of earlier and robust competition from cheaper generic versions of those products"); A55-56 ¶¶ 164-65 (claiming that, "[b]ut for Defendants' unlawful actions," Hartig "would have benefitted from the presence of [] low-cost generic … alternative[s]" to Zymar and Zymaxid that the Defendants' embattled competitors "could and would have supplied"); A57 ¶¶ 177-78 (same); A59 ¶¶ 190-91 (same).

[14] We have repeatedly cautioned against allowing a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction to be turned into an attack on the merits.  Caution is necessary because the standards governing the two rules differ markedly, as Rule 12(b)(6) provides greater procedural safeguards for plaintiffs than does Rule 12(b)(1).  First,

23

recently reaffirmed in *Davis v. Wells Fargo*, "dismissal via a Rule 12(b)(1) factual challenge to standing should be granted

proceeding under Rule 12(b)(1) inverts the burden of persuasion. When presenting a Rule 12(b)(6) motion, the defendant bears the burden to show that the plaintiff has not stated a claim. But under Rule 12(b)(1), the plaintiff must prove the court has subject matter jurisdiction. The two rules also treat the complaint's factual allegations very differently. Unlike Rule 12(b)(6), under which a defendant cannot contest the plaintiff's factual allegations, Rule 12(b)(1) allows a defendant to attack the allegations in the complaint and submit contrary evidence in its effort to show that the court lacks jurisdiction. Thus, improper consideration of a merits question under Rule 12(b)(1) significantly raises both the factual and legal burden on the plaintiff. Given the differences between the two rules, a plaintiff may be prejudiced if what is, in essence, a Rule 12(b)(6) challenge to the complaint is treated as a Rule 12(b)(1) motion.

*Davis*, 824 F.3d at 348–49 (internal citations, quotation marks, and brackets omitted). Because Rule 12(b)(6) is the preferred mechanism for the early testing of a plaintiff's claims, and because defendants are nevertheless likely to prefer the relaxed standards of Rule 12(b)(1), district courts confronted with arguments framed as 12(b)(1) challenges to jurisdiction should approach those arguments with particular care.

sparingly," *id*. at 350, and it is only the "unusual" case that will be properly dismissed under 12(b)(1) "when the facts necessary to succeed on the merits are at least in part the same as must be alleged or proven to withstand jurisdictional attacks," *id*. (citing *Mortensen*, 549 F.2d at 892) (internal quotation marks omitted).  In this case, Hartig has not alleged claims "so … completely devoid of merit as to not involve a federal controversy." *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895, 899 (3d Cir. 1987) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666 (1974)).  On the contrary, it had Article III standing sufficient to give the District Court subject matter jurisdiction, and thus a dismissal under Rule 12(b)(1) was not legitimately in play.

### C.  Review Under Rule 12(b)(6) Rather than Rule 12(b)(1)

Because "we may affirm on any basis supported by the record," we next consider whether the District Court could have granted Allergan's motion to dismiss under the Rule 12(b)(6) framework.  *Davis*, 824 F.3d at 350.  The Defendants admit that Allergan, in styling its Rule 12(b)(1) argument as one of constitutional standing, "did not make an argument in the alternative under Rule 12(b)(6)." (Defendants' Letter Dated June 24, 2016, at 2 n.1.)  Even had the Court treated the 12(b)(1) motion in the alternative as the 12(b)(6) motion that it actually was, the decision would nonetheless be unsound because the Court relied upon the DSA, whereas it should have measured Allergan's motion primarily "against the bare allegations of the complaint." *JM Mech. Corp. v. HUD*, 716 F.2d 190, 196-97 (3d Cir. 1983).  As mentioned above, for purposes of Rule 12(b)(6), a court "must consider only the complaint, exhibits attached to the

complaint, matters of public record, as well as undisputedly authentic documents if the complaint's claims are based upon these documents." *Mayer*, 605 F.3d at 230.

Allergan has argued that the DSA can be considered in a 12(b)(6) analysis because it is a document "integral to or explicitly relied upon in the complaint." D.I. 15, at 5 n.1 (quoting *Warren Gen. Hosp.*, 643 F.3d at 82 n.4). Not so. The DSA was never mentioned in Hartig's complaint, was not attached to the complaint, was not a matter of public record,[15] and did not form a basis for any of the claims.[16] Although Allergan cites authority suggesting that the District Court could have considered the DSA "to determine whether the plaintiff was a direct purchaser," *id.*, Hartig's complaint readily acknowledged that the company was an indirect purchaser, and instead predicated its antitrust standing on an assignment from Amerisource, itself a direct purchaser. Rule 12(b)(6) requires that those specific allegations be accepted as true and viewed in the light most favorable to Hartig. Thus, we cannot say that the DSA was integral to Hartig's claims. It is integral only to the Defendants' attack on those claims.

---

[15] In fact, for purposes of this appeal, the DSA has been filed separately under seal, and it states at the bottom of every page that it is "confidential" and "not to be shared with any third party." (A100-15.)

[16] The complaint does not mention Amerisource at all except for the single paragraph alleging that (1) Amerisource "directly purchased branded Zymar and Zymaxid from Defendants" (A25 ¶9), (2) Hartig purchased those same drugs from Amerisource, and (3) Amerisource assigned its antitrust rights to Hartig.

26

Because the DSA is extrinsic to the complaint, the District Court could not have properly considered it for purposes of a Rule 12(b)(6) motion to dismiss, and, without the DSA, Allergan's entire challenge to the validity of Amerisource's assignment lacks a foundation.

For the District Court to have considered documents that, like the DSA, lie outside the bounds of the complaint, it would have had to do so by "convert[ing the 12(b)(6) motion] into a summary judgment proceeding and afford[ing] the plaintiff a reasonable opportunity to present all material made pertinent to a summary judgment motion by Rule 56." *JM Mech. Corp.*, 716 F.2d at 197; *see also Rose v. Bartle*, 871 F.2d 331, 342 (3d Cir. 1989) ("We have held that it is reversible error for a district court to convert a motion under Rule 12(b)(6) … into a motion for summary judgment unless the court provides notice of its intention to convert the motion and allows an opportunity to submit materials admissible in a summary judgment proceeding or allows a hearing."). Because the District Court considered the DSA under Rule 12(b)(1), none of those procedures were followed. It may be, as the Defendants urge, that "Hartig would not have objected to the district court considering the DSA on a Rule 12(b)(6) motion." (Defendants' Letter Dated June 24, 2016, at 2 n.1.) Based on the record before us, though, that assent is still theoretical: Allergan did not proffer its anti-assignment argument in the alternative as grounds for dismissal under Rule 12(b)(6); the District Court did not consider the DSA under that framework; and Hartig thus had no occasion to formally waive any of its 12(b)(6) protections or to respond, after proper notice, to a converted motion for summary judgment. We will not affirm on such a record, but instead will remand so that the parties may have the opportunity to

make their arguments under the proper procedural framework, with its attendant safeguards.

Once the correct procedures have been followed, the District Court may have occasion to interpret the effect of the DSA. Therefore, considerations of judicial economy merit our noting some doubt about the Court's interpretation of the DSA as barring the assignment of antitrust causes of action.

In light of the DSA's choice-of-law provision, the District Court correctly looked to Pennsylvania law to determine the DSA's effect, but it may have misstepped in its choice of interpretive principles. It cited *Crawford Central School District v. Commonwealth*, 888 A.2d 616, 623 (Pa. 2005), for the idea that "an assignment will ordinarily be construed in accordance with the rules governing contract interpretation and the circumstances surrounding the execution of the assignment document." In Pennsylvania, the "[c]onsideration of the surrounding circumstances" does not appear to be a general principle of contract law, *U.S. Nat'l Bank in Johnstown v. Campbell*, 47 A.2d 697, 700 (Pa. 1946), but rather has developed as a principle of interpretation specific to assignments. *See Horbal v. Moxham Nat'l Bank*, 697 A.2d 577, 583 (Pa. 2001) ("In interpreting an assignment, it will ordinarily be construed in accordance with the rules of construction governing contracts and the circumstances surrounding the execution of the assignment document."). Perhaps because this case implicated an assignment, the District Court considered not only the language of the DSA, but also expressly considered the "circumstances" surrounding that agreement. (A11 n.4.) The problem with that approach is that the Court was not interpreting an assignment. The DSA, not the assignment agreement, was

28

under scrutiny, and the DSA is simply a contract, not an assignment. Thus, it seems likely that Pennsylvania's general principles of contract interpretation should have applied, which focus on the "clear and unambiguous" language of an agreement "as *manifestly expressed*, rather than as, perhaps, silently intended."[17] *Amoco Oil Co. v. Snyder*, 478 A.2d 795, 798 (Pa. 1984) (original emphasis) (internal quotation marks omitted); *see also LJL Transp., Inc. v Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009) ("When the words of an agreement are clear and unambiguous, the intent of the parties is to be ascertained from the language used in the agreement, which will be given its commonly accepted and plain meaning." (internal citations omitted)). But that is a question for the District Court to address, if necessary, on remand.

## V. CONCLUSION

We part from the District Court in its treatment of antitrust standing as a factual challenge to subject matter jurisdiction under Rule 12(b)(1), and we reject the proposition that the Court could have considered the extrinsic

---

[17] The DSA's limitation on assignments provides that "[t]his *Agreement* may not be assigned" without prior written consent, but that "either party may assign its *rights and obligations hereunder*" without written consent if the assignment is to a "subsidiary or affiliate." (A108 (emphasis added).) Because Amerisource's antitrust causes of action arise by statute, there is a serious argument that they do not fall within the DSA's plain language limiting assignment of "rights and obligations hereunder" – that is, they arise by operation of an extrinsic legal regime rather than by contract.

evidence of the DSA's anti-assignment clause under Rule 12(b)(6). The case should not have been dismissed pursuant to Allergan's Rule 12(b)(1) motion. Therefore, we will vacate the order of dismissal and remand for further proceedings.